Trireme Energy Holdings, Inc. v. Innogy Renewables, Inc. Mr. Marmon, good morning. Good morning. Nathaniel Marmon for Appellants Trireme. Good morning, Your Honors, and may it please the Court. Appellee Iris abused its discretion by arbitrarily abandoning Casadiga's 2020 commercial operation date, and the District Court applied the wrong standard in retroactively justifying that arbitrary decision. Based on de novo review of the law and the undisputed facts, this Court should reverse and issue judgment in Trireme's favor for $69.7 million. Three key points. First, Iris owed a duty of good faith to Trireme, including a promise not to act arbitrarily or irrationally. Second, the District Court applied the wrong legal standard. And third, at trial, the undisputed evidence established as a matter of law that Iris breached and caused Trireme's damages. Can I ask you a question? I'd like to start... You're focusing, at least in this Court, I'm not sure, at trial, on the decision to change the COD, the date. But why is that the relevant frame? That is to say, I mean, let's assume, in a hypothetical world, that Iris, whatever it's called, never changed the date whatsoever and that that was arbitrary because, you know, the delays, somebody should have recognized that they weren't going to meet the 12-31-2020 date. But let's say that they never changed it at all and still met the deadline for the milestone. Would that constitute a breach of the... I mean, putting aside causation issues, would that constitute a breach of the duty of good faith and fair dealing? In other words, isn't the relevant question here whether they did what they needed to do to try and meet the deadline and not the question of whether, at a discreet moment, they properly considered and reported that the date had changed? Number one, the decision to change a deadline is going to affect whether you complete a project by that deadline. So if a court says your briefs are due on... And was there evidence to support that? I mean, this goes to their alternative argument about causation, but the district judge seemed pretty clearly to hold on page 40 of the special appendix that plaintiffs failed to provide evidence that IRIS could have even reached the COD for the project if it had done more. So, I mean, is it clear from the record that the date actually did have any bearing? Absolutely, Your Honour, for the following reason. IRIS's own internal evaluation of the projected COD, until the arbitrary decision to change it, was that they would still meet the December 31, 2020 deadline. But Mr. Berdez testified that even after they changed the date, they continued to work just as hard to try to complete it, that they made no... They didn't slow down. They didn't say, you know, now that we moved the date, let's do X, Y, and Z. We're not in any rush. He said, even though we changed the date, we did everything we could to try to get it done. So why can't the district judge credit that? The scheduling for the project is built off of the COD. If you change the deadline, you're not going to finish by the previous deadline. What did they do after they changed the deadline to slow the project down? Because they had changed the deadline. What did they do? There's no specific evidence in the record about the manner in which the schedule changed. I can't point you to a particular refinement to the schedule that reflected the change of deadline, but the evidence is that the deadlines dictated the schedule and the schedules were built off of that. Didn't the district judge literally make findings to the contrary? That is to say, over and over in her opinion, she credits the testimony of those who actually worked on the project that even after the Safe Harbor extension was granted, so separate and apart from the COD moving, that IRIS continued to, quote, diligently work toward a 2020 COD after the extension, continued to work diligently toward meeting the 2020 deadline even after they changed the projected date. In other words, you're asking us to make a finding that's contrary to the district judge's without even arguing that it was clearly erroneous. The finding is nuanced. The district court did not find that they continued to work towards a 2020 COD after changing the deadline. After deciding we're not going to finish in 2020, I don't believe the district court found they did in fact continue to try to finish in 2020. And there's a more fundamental problem, which is that the actual evidence of the witnesses is crystal clear on this. And let me walk you through. I mean, you are arguing that it was clear, as I understand it, because the evidence to which the district court cited, this is your argument, is not actually, doesn't back up the finding. Is that your point? That's correct, but there's a more fundamental problem. Wow, more fundamental than clear error. Well, yes, because the district court, Your Honor, applied the wrong standard and concluded incorrectly that she could retroactively justify an arbitrary decision. Because there was no, because, and you use this term hindsight evidence, but because there was no testimony that would have shed light or from which she could have inferred an immediate decision, rational decision to change the date. Is that the argument? That's close. Let me explain it in a little more detail because it's a little bit more nuanced. Until late August of 2020, Iris itself believed and concluded, based on its own analysis that is documented in the record, that the Casadega schedule was tight but achievable, despite all the prior delays and challenges that the district court relied on in its decision. But didn't your client have a different view and had discounted the probability of meeting that deadline to 30% or even zero? Yes, Your Honor, because my client didn't have any information. They had stopped providing information about the project before the COVID delays began, and so my client, without having updated information, didn't know what was going on. It's your fundamental position that they gave no reasons when they changed the date to 2021, and that made it arbitrary and that the district court made up the reasons. Isn't that what your argument is? Essentially, yes.  We're getting close. We have one minute. Let's assume that's your argument, because that's what I thought your argument was. She cited several things from the record about why they changed it. For example, on Appendix 2839, the project manager, Perterbaugh, he was asked, why is it that you projected COD change to 2021? This exact question. Why did it change, even though you thought up to that point? And he said, the COVID delay was by far the biggest. In fact, it delayed us for a long time. And then he said, these other things that happened, we tried to accelerate it, but as time went on, the subsequent delays we saw in August and into September, we thought by September 15th, it wasn't going to happen. And then he's asked later about that again, and he said, JBS slowed its performance. And Mr. Badez, who you say said nothing about the reasons, was specifically asked the same question. Do you recall any of the specific issues around the Casa Daga project that it would be given rise to delay in the schedule as of August of 2020? And he said, I believe one of the issues was the difficulty with the first foundation pour, that they had, the foundation broke, right? Cracked. So those are three different reasons that the two people who were in the best position to know why in August it was not going to happen. So why isn't that enough? Let me explain. It's very clear from the record.  The explanation. Mr. Puderbaugh, who the district court slated, the project manager, he testified unambiguously, I do not have the authority to change the deadline. It is my job to meet the deadline unless and until management changes the deadline. So Mr. Puderbaugh... But he gave management the reasons of why he, he was in the best position to determine this is the project manager. Here are my reasons for why we're not going to meet the date. And then the date changes, right? Here's the kicker. Mr. Puderbaugh emailed Mr. Bedouz and said, I think we might need to officially change the COD to 2021. And Mr. Bedouz wrote back very clearly and said, I need much more detail. And what's critical here is his testimony on direct at trial. This is what he said. He didn't just sign off on the decision. He didn't say based on the prior delays that I know about, I agree with you that it would be appropriate now to change COD. He did not say that. He testified, quote, because I was still keeping my eye on the prize, the prize meaning completion in year end 2020, unquote. That's why he asked for much more information. And he further explained if this is a quote, if not withstanding all our efforts, there was some indication we couldn't make it. I needed to understand in great detail why, and that we've tried everything we could possibly try to carry that out. Unquote. That's it a 2128 in the record. In other words, the person responsible for making the decision said all of this information and the information that district court relied on, I know about it already, and it was not sufficient. So what you would have required, as I understand, is effectively a smoking gun document or testimony that says that laid out the decision on a precise date for why they were delaying the COD. Is that what? No, Your Honor. So what was the point of your answer? Then the, the court in Dalton explained very carefully that a, a party with discretion cannot exercise that discretion arbitrarily or irrationally here. But in Dalton, the contract specifically provided that the student could submit evidence to ETS. And the court simply said that, you know, that provision of the contract would be undermined and rendered, you know, useless if it didn't come with it, an obligation to review that there's no such provision in the contract here. In other words, if anything, you're asking us to rewrite the contract. Surely your client could have bargained for a provision that either tethered the COD date to the tax incentive deadline, or, you know, provided some sort of protections in, in the event that there was a movement of the tax deadline, but there's no provision in the contract here that you're seeking to, to sort of enforce in the same way that the Dalton contract involved. That's correct,  Your Honor. But as a judge Lyman noted in the Southern telecom case, the Dalton decision is the starting point for any analysis of an abusive discretion under a contract. And the Dalton standard is, and it's been quoted over and over again by the New York courts and by this court. The standard is cited by judge Roshan in this very case, was it not? And she, she, she analyzed what had happened incorrectly under that standard because she applied a retroactive justification. But the standard is that a party cannot act in the moment, arbitrarily or rationally in exercising discretion.  what is it, what is it that the district court could have latched onto or relied on or cited that would have satisfied you that there was a, that didn't use a wrong standard or didn't focus on the wrong facts. Just give me one example. Mr. Biddu is the executive in charge of the decision with the authority to make the decision testified at trial. All he had to do was say, when I asked for the information to justify the change, I got some information and I got comfortable with the change. He never said that it's remarkable that on a $350 million project with a $69.7 million earn out at stake, that the executives literally didn't get any information. The district court was not, I think this must be your argument, able based on the testimony or other documentary evidence to infer that exactly. Your honor, because the witness testified that he didn't do anything that he didn't get any information. So you, so you're, you would ask us to limit the inferences that the district court could draw from what it saw, what it heard during the trial, unless she's drawing upon evidence of what the executive actually considered. And there is no evidence in the record of that other than him saying, I didn't get the information that I needed. And remember, he said until August 24th, knowing everything that I knew about the project, including prior delays, including COVID COVID that was all baked into his knowledge. And he said, also testify that even when the date changed, he continued to do everything he could to meet that date. You want to ignore that part of his testimony or not? I don't think that he said, I continue to try and finish by the end of 2020. I did everything that I possibly could. District court, the district said district court found, even after recognizing that a projected COD of 2020 for the Cassandra project was unrealistic. They aim to still complete the project as soon as possible. As late as September of 2020, they were pushing to maintain the schedule. So she's citing the fact that even after they changed the estimated date, they continue to do everything realistically possible to meet it. And that was his testimony as well. So you're, you're suggesting that that was bad faith because when he was presented with the project matter, with all these reasons why it wasn't going to happen and they didn't want to mislead anybody. So we're going to change the date that, because he said, you know, I want some more detail. This is a big deal to change the date. And he continued to try to meet the date that that's bad faith. And that seems a little bit backwards. Not just that your honor, But he'd actually affirmatively concluded until late August that they were on schedule and he needed new information to change his mind. Information he never got. And then let me ask you one more time. What did he do after they changed the date, which you say was done without his approval, right? It was changed without his approval. Correct. The record is silent on whether he actually approved it or didn't approve it. He didn't agree that the date should be changed. What did he do when they changed the date that slowed it down? What did he do differently? That changed that once they changed the date, the project was not on schedule any longer at that point. They changed. No, they continue. They still wanted to build the project. There's no doubt that they wanted to build the project, but they gave up on finishing by the end of the year. And by arbitrary, the law is clear that negligence, you know, the failure to complete by that time doesn't alone give rise to a breach of the implied covenant. You need to show arbitrary, you know, bad faith, et cetera. And I think the question, and this really goes to the causation question is, you know, what impact did that decision have? The district judge made a explicit finding that they continued to work diligently and conscientiously to try and get it done by the date and just failed. So the fact that they didn't meet it is not alone sufficient to support your proof. And let me ask you on this, you, you, you argue that they waived this because they didn't raise causation below. Causation is an element of the claim and it's your burden to prove the claim. So if you didn't prove causation, doesn't your claim fail? Didn't the district judge make a finding that you had failed to prove causation? And aren't we free to affirm on any basis that find support in the record? Yes, you're free to affirm. They waived the argument. They didn't raise causation with respect to good faith. They raised it with respect to a different issue only. And the district court, as I understand the decision, didn't hold, didn't find that not, that they continue to try to seek a schedule to complete the project in 2020 after deciding not to. And that, that is important in terms of causation. We did prove causation because immediately before the breach of good faith and fair dealing immediately before the arbitrary decision, the company said we're on schedule. And the district court itself said in its decision on page 24, that the schedule was tight, but achievable. So if you're on schedule and then you arbitrarily change the deadline to  the arbitrary decision is the thing that causes you to no longer finish on time. And that is the contemporaneous evidence. You've reserved some time for rebuttal. So I thank you. We'll hear from counsel for the appellees. Thank you very much. Good morning. Good morning. Your honors may please the court. My name is Susan leader. And along with my colleague, Mr. Richland, we represent the appellees, energy renewables, U S and energy SC. Well, simply referred to as Iris. And before I begin, because we were granted permission to split our time, I was just going to briefly give you an overview of what's going on.       I'm going to give you a brief review of what I'll be addressing and what my colleague will be addressing. So I don't inadvertently tread on topics that he is more prepared to address than I am. And there are two primary arguments that I plan to address. And the first is that contrary to appellants argument, the district court made numerous factual findings in support of its opinion, that Iris's decision in September of 2020 to change its internal projection as to when the Casa Dega project would reach commercial operation. Those were, there's numerous points that we can cite to in the record. And those were all reason in nature and appellants, excuse me, appellants may disagree with these factual findings, but they are not clearly erroneous. The second argument advanced by appellants council that I will address is that the district court, even if she had not made the factual findings, she did as to the reason and deliberate nature of the decision in September of 2020 to change its internal projection for completion of the Casa Dega project. It wouldn't change the outcome here is the law is clear that the implied covenant cannot be used as a pound's urge to create a new contractual obligation. That would be inconsistent with the other terms in the agreement. And my colleague, Mr. Richland will be addressing the argument contained in section four of our brief, which really relates to appellants inability to demonstrate how a change in the internal projection for the completion of the Casa Dega project, how that caused any damages. And I was going to start with addressing the factual findings made by the district court. And as an initial matter, our position is that the district court didn't even need to engage in the analysis as to whether or not this one decision in September of 2020 to adjust Iris's internal estimate as to when the project would reach commercial operation that did not need to be deliberate in nature, but the court did engage in that analysis and made a number of factual statements. And the internal projection was both reasoned in nature and not arbitrary. And in fact, I'm looking at from the special appendix, page 37 of that opinion, but the district court held specifically that plaintiff's suggestion that RWE, Iris's successor, the suggestion that RWE acted without a sound basis in reason and without regard to relevant facts. When it ultimately determined that the COD would likely move to 2021 mischaracterizes, the deliberations with which defendants monitored Casa Degas progress, considered ways to speed up construction and eventually decided to adjust their timeline. And the, the, the major argument, I think, on the other side by Mr. Marmon is that this relied on what he describes as hindsight evidence, as opposed to evidence of a contemporaneous decision, an actual decision. You heard the question, what, what would you need? Is there anything of that sort in the, in the record to which you can point us? Well, certainly what the court did was found that the, there were several witnesses who testified about all of the factors that delayed the Casa Degas project. And that led to the decision in September of 2020 to adjust the internal timeline. So it was not just the testimony of Mr. Baduce who testified at length at trial about problems that the project occurred during his brief tenure at the company. And he joined in July of 2020 and the decision to adjust the internal expectation as to when it would reach COD was made just a couple of months later in September of 2020. But even in that short window of time, there were problems that occur in the project relating to COVID and it doesn't take a great imagination to fathom what kind of challenges the project faced in upstate New York, when it's trying to be constructed during the middle of this huge pandemic, there were COVID outbreaks, there were challenges getting resources on the project site relating to those COVID outbreaks. And obviously the company took very seriously, even though it wanted to complete construction as soon as possible, it didn't want to endanger. I got all that. But in answer to judge lawyer's question, is there any evidence in the record of the actual reasons that the company adopted at the moment in September, 2020, the actual reasons to adjust the date, or is it just an inference from all of what the testimony was about the delays that those were the reasons. The court found the district court found that all of the testimony. So not just Mr. But Mr. And Mr. Who were both supervising the project. She found that they testified consistently incredibly. No, no, no. Would you answer that question? So the question is, is there any evidence? Forget the district court's finding. One of the charges is that there was no evidence to support the district court's finding. Was there any evidence in this record about a particular decision that was made by whoever could make the decision on behalf of your clients to delay the project beyond December 31st, 2020. Well, I think believe that the district court relied on was the testimony of the witnesses about the reasons that went, that were considered in having to adjust the timeline. This wasn't a decision made at a particular point in time. What the district court pointed to was that there were ongoing discussions about whether the project would meet the timeline cited this testimony on Mr. Appendix 2839. This is the testimony she cited where Mr. Porter bar said, why is it that the project COD for Casa Dega changed in 2021? The COVID the way was by far the biggest impact that effectively delayed our civil access road and foundation conduction construction by eight weeks. And then he talks about the subsequent delays we saw in August and into September. And we thought it wasn't going to happen. Isn't that what she relied on? That's the testimony in part, at least that she relied on that. And the fact that Mr. Badoos testified that he knows that he would have spoken with Mr. Peter bow in connection with adjusting the internal timeline. And that is from the record. I special appendix 28 to 29 that the court finds credible.  And the fact that Mr. Badoos is testimony that Iris revised the projected COD to 2021. Only after confirming that it tried everything within its power to complete the project in 2020. And the relevant testimony for Mr. Badoos is that he would have spoken to Mr. Peter bow. And he doesn't know who else he might've spoken to at that exact moment in time in September of 2020. But this decision was not made in a vacuum. And the court heard during a week long trial, not just testimony again from Mr. Badoos who appeared live to testify, but there were three volumes of deposition testimony for Mr. Peter bow, who was the project manager. As well as testimony from Mr. Walton, who all testified at length. And there was volumes of evidence presented as to all of the challenges that contributed to the land. So your argument presumably is there was totally fair to, for the district court, To infer from all those facts that the decision was to delay based on COVID based on. Is that right? Well, I want to correct something that your honor stated, which is there was never a decision to delay construction of the Casadega project. My client is not in the business. They don't actually, they're not boots on the ground, building the project. They're relying on the performance of their outside contractors who are on the site constructing the project and the project schedules and the timeframes that my client provided for those vendors to complete the construction. They never changed the target of completing construction in 2020. Never changed. And we have testimony to that in the record that I think the district court cited to, which is even after. The client realized, look, this timeline is probably not feasible. We've encountered one delay after another and it's September of 2020. December is just a few months away. We have to be realistic here in managing our own internal expectations as to whether or not this project is going to become operational in the next few months. That decision was made. And the evidence, the piece of evidence that appellants rely on the most is a communication. Between my client to try green, where they ask, look, has there been any change to your estimate as to when this project will be completed? And the response was our current estimate is now March of 2021. This did not result in any communications to any of the construction workers saying, Hey guys, by the way, slow down. You don't need to keep working at the same frenzy pace because we're now, you know, Taking the foot off the gas, so to speak and pushing off the construction. We'll, we'll hear from your friend. Thank you very much. Good morning. May please the court Eli Richland of Wilson, Sonsini for defendants at police energy. I will briefly address the causation issue and appreciate the opportunity. The district court found expressly that the plaintiffs have not provided evidence that Iris could have even reached COD for the cast. They got project in 2020. If it had done more and that's from the special appendix at 40. Now try and complains. It would be unfair to consider the causation issue now, because it could not quote develop the factual record on this issue below. That was in the reply at 25, but that was not for lack of trying. Try and presented expert witnesses to testify as to alternate measures. Energy's construction personnel could have undertaken to finish constructing the project by 2020. And the district court rejected that testimony. After view of those experts experience. Credentials. The court ruled, neither testify that the casting of project could have achieved a COD in 2020 special appendix 41. Neither expert took any steps to determine whether the labor or equipment arguably needed to complete Casa Dega within 2020. What's available, especially in light of the COVID-19 impact, the special appendix at 41.  Marmon argued that you didn't argue causation, at least as to this claim in the, in the court below. Can you address that? Yeah, I do find that a bit mystifying and I would, I would direct the court to the post trial brief at appendix 6051 to 6056. There is extensive discussion of the trial testimony and the failure of the experts that trireme had proffered and presented to the court to present evidence, demonstrating that a COD within 2020 was achievable. This was not an issue invented by the court. The district court below, when it reached the factual finding, it was not invented by energy solely for appeal. It was litigated and decided, and there was no causation. If there's been any waiver, it's been of trireme, which failed to actually challenge and identify as clear error. The factual finding that there had been no causation in any event, there's been no identification today of any clear error in the district courts, factual findings on causation and the CA the court cannon should affirm on this basis. So you said appendix 6051, 6051 to five to 6056. It's the post trial brief from energy and it includes extensive discussion that I'll just pull it right up. It's defendants updated, proposed findings of fact and conclusions of law. And the subheading is the court does not, again, as a proposed finding of fact, the court does not credit plaintiffs experts concludes reclaim that energy could have achieved COD in 2020. And it goes on to discuss the evidence presented at trial. Okay. Thank you. Thank you. Let me address a couple of things. First, you did not hear from my learned friends about any contemporaneous evidence of anyone actually considering any information whatsoever after August 24th about whether to change the deadline. That's because on August 24th management still thought that they were on schedule. As the district court said it was tight, but achievable up until mid August. And there's no evidence of any change. All of the problems that my learned friend talked about are problems that were baked into the analysis already by the end of August. Indeed, there's an August 13 email from Mr. Badooz, the head of construction to his boss, the CEO, Sylvia or teen. And on August 13th, he went through a list of seven issues with the project. Can I ask you, it sounds like you're demanding of them. What we often demand of an administrative agency that they, you know, basically have a, an administrative record that demonstrates that the, the issues that they considered and the reasons they gave and the law in that context is clear that a court reviewing the decision is indeed limited to the, the reasons that were actually considered and not some post hoc rationalization. You rely on that case law. Do you have any authority for the proposition that that case law is applicable in the breach of contract or implied covenant case in context? There's a case Doe versus hodiatric medical examiners where is it cited in your brief? It is cited in the brief where the, I think judge forest, the Southern district relies on the court of appeal decision in Heinz for the standard of what's arbitrary and irrational. Heinz was a, a, an article 78 proceeding. So there is at least one case that sort of leans on the language from those article 78 proceeding cases for information about what arbitrary and rational means in this context. And here's what I would say to that. When judge K wrote Dalton and used familiar language of, you know, an arbitrary and irrational exercise of discretion, she was using familiar language from those administrative law cases that are more well developed. And I think that's at least a clue as to what she meant and how the court of appeals would define the standard with greater precision. If it were asked to do so just in interpreting the words, what an arbitrary and irrational exercise of discretion means. I want to correct an error. I'm sure inadvertent by my learned friend, the testimony on a 2257 from Mr. Badooz is quote, do you recall any discussion you had with Mr. Puderbaugh in between August 24th and September 1st concerning setting a new COD for Casadega? I don't recall. There is no evidence after the question was raised of should we change our minds about whether we can finish on time? There's no evidence of any further discussion or analysis. And this is contrary to their own practices. Every other decision about the project, big and small, there's a PowerPoint deck, there's memos, there are emails. Indeed, I was telling you about the August 13th email that was to raise an issue about the project manager resigning. It's sort of an HR issue and there's a lengthy email between Mr. Badooz and his superior laying out what he regarded as the issues with the project. But the testimony is that he still thought the project was on schedule even after considering those very issues, the issues that my learned friend referred to. Was there not testimony from Mr. Badooz that he doesn't always get these specific documents that you're requiring of the other side as a matter of evidence? I don't believe so, Your Honor. In fact, he testified expressly that for a change of this type, changing COD, he would expect a written cost benefit analysis. And so, yes, Your Honors, ordinarily we would think, as you said, in the administrative law context, you expect a certain kind of record. You would expect, based on the way this organization operated, that there would be some record, but they didn't do anything. The district court rejected that precise argument in footnote five of its opinion, did it not? And is your argument that she was wrong in doing that? Our argument is that the evidence in this case is that they didn't do anything. They didn't necessarily need to create a record, although that would have been rational given the way that the organization operated in general. But they didn't do anything. There's no evidence of anything. I also want to address, you know, the Puderbaugh evidence that Your Honor mentioned. Mr. Bedouz did not testify that he relied on that. This is the project manager, the one who suggested making the change, but Mr. Bedouz didn't rely on it, and there's no evidence that he did. Also, Mr. Puderbaugh did reach out to Mr. Bedouz, on September 1st, this is A4339 in the record, and he said, people are asking, are we going to change the COD? So, yes, there is record evidence that the change of COD was going to have an impact on the schedule, and people were asking about the change of COD. It is not a trivial thing. If you arbitrarily change a deadline, you're not going to meet that deadline. That's the causation, and that's also the breach. Thank you very much, Your Honor. Court is adjourned.  We'll reserve decision. Appreciate it.